UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

| | |
|---|---|
| LOUIS VUITTON MALLETIER S.A., § § Plaintiff, § § v. § § SWAP SHOP INC., SWAP SHOP § MANAGEMENT, L.L.C., 3290 SUNRISE § INVESTMENT, INC., PRESTON B. HENN § and BETTY D. HENN, § § Defendants. § | Case No. _____ |

# COMPLAINT

For its Complaint, Plaintiff LOUIS VUITTON MALLETIER S.A. (hereinafter "Louis Vuitton"), by and through its undersigned counsel, avers and alleges as follows:

### I.   NATURE OF THIS LAWSUIT

1. This is an action by Louis Vuitton against Defendants SWAP SHOP INC., SWAP SHOP MANAGEMENT, L.L.C., 3290 SUNRISE INVESTMENT, INC., PRESTON B. HENN and BETTY D. HENN (collectively, "Defendants") for contributory trademark infringement. Simply put, Defendants — the owners, operators, landlords, managing agents and/or principals of the Swap Shop flea market in Fort Lauderdale, Florida (the "Market") — have leased and/or continued to lease space to vendors, tenants, sub-tenants, lessees, sub-lessees, licensees, sub-licensees, assignees, and/or other occupants at

1

the Market (collectively, "Tenants") that Defendants knew or had reason to know were selling or offering for sale merchandise bearing counterfeits of Louis Vuitton's federally registered trademarks.

## II. JURISDICTION AND VENUE

2. The claim herein arises under the provisions of the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.* for contributory infringement of trademarks registered with the United States Patent and Trademark Office.

3. This Court has original jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1332 and 1338.

4. This Court has personal jurisdiction over Defendants. Defendants: (a) reside in this District and in the State of Florida; and (b) conduct business in this District and in the State of Florida.

5. The vast majority of the conduct complained of herein occurred in this District and in the State of Florida. Furthermore, Defendants' liability to Louis Vuitton arises from, and/or is related to, Defendants' activities within this District and in the State of Florida.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## III. THE MARKET

7. The Market is one of largest indoor/outdoor flea markets in the South. It is located on approximately eighty-eight (88) acres in Fort Lauderdale, Florida. The address of the Market is 3291 West Sunrise Boulevard, Fort Lauderdale, Florida 33311.

8. The Market has over a thousand (1,000) dealer spaces, a food court (serving breakfast, lunch and dinner), a fourteen (14) screen theater, entertainment, amusement rides and paid parking for the many shoppers that frequent the Market.

9. The Market is open every day of the week, including holidays. It is a multi-million dollar business that is worth an eight or nine figure fortune to its ultimate owners, the members of the Henn family named in this action.

10. The Market is also a hot bed for illicit activity. Apart from the significant amount of crime that has taken place at the Market, many of the Market's Tenants have been engaged in the sale of counterfeit merchandise. In fact, it is well known that the Market is the place to go if one is looking to purchase counterfeit items.

### IV.   THE PARTIES

11. Plaintiff Louis Vuitton is a *societe anonyme* organized and existing under the laws of France.

12. Defendant Swap Shop Inc. is a Delaware corporation with its principal place of business at 3291 West Sunrise Boulevard, Fort Lauderdale, Florida 33311. It is owned by Defendants Preston B. Henn and Betty D. Henn, who are husband and wife.

13. Defendant Swap Shop Management, L.L.C. is a Florida limited liability company with its principal place of business at 3291 West Sunrise Boulevard, Fort Lauderdale, Florida 33311. The sole managing member of Defendant Swap Shop Management, L.L.C. is Defendant Swap Shop Inc.

14. Defendant 3290 Sunrise Investment, Inc. is a Florida corporation with its principal place of business at 3291 West Sunrise Boulevard, Fort Lauderdale, Florida

33311.  Defendant 3290 Sunrise Investment, Inc. owns the land upon which the Market operates and is owned by Defendants Preston B. Henn and Betty D. Henn.  Defendants Swap Shop Inc., Swap Shop Management, L.L.C. and 3290 Sunrise Investment, Inc. are sometimes hereinafter collectively referred to as the "Swap Shop Entities."

15. Defendants Preston B. Henn and Betty D. Henn (the "Henns") own the Market.  The Henns are individuals who reside in this District and do business in this District at the Market.  For several years, the Henns have been managing members of Swap Shop Management, L.L.C. and officers and directors of both Swap Shop Inc. and 3290 Sunrise Investment, Inc.  At all times mentioned in the Complaint, the Henns were the agents of the Swap Shop Entities and the Market.

16. A substantial portion of the profits made by the Swap Shop Entities and the Market have ultimately flowed directly or indirectly to the Henns through various means, including, but not limited to, distributions, salaries and management fees.

17. The Henns have an office at the Market and are the moving, active and conscious forces behind the operations, actions and inaction of the Swap Shop Entities and the Market.  Among other things, the Henns manage, supervise, direct, control, ratify, authorize and/or participate in, the operations, actions and inaction of the Swap Shop Entities and the Market.  The Henns frequently walk the Market and/or ride around the Market on one of its many golf carts.  The Henns also have complete access to the many cameras installed at the Market.

4

18. At all times mentioned in the Complaint, the Henns, in doing the things alleged in the Complaint, have acted within the course and scope of their agency and employment.

19. The Defendants collectively run, manage and operate the Market. The Swap Shop Entities enter into leases with the Market's Tenants, receive rent payments from the Market's Tenants and/or make the Market's leasing decisions in accordance with the Henns' directions and instructions.

20. Prior to the filing of this lawsuit, Defendants have been repeatedly notified of specific Tenants engaged in counterfeiting at the Market, including numerous repeat offenders. Prior to the instant lawsuit, Defendants have been sued by at least one other intellectual property owner for continuing to lease space to Tenants that Defendants knew or had reason to know were selling or offering for sale merchandise bearing counterfeits of that IP owner's federally registered trademarks.

21. At all times mentioned in the Complaint, each of the Defendants has informed the other Defendants of their actions, inaction, and the unlawful activities transpiring at the Market.

### V. LOUIS VUITTON'S PRODUCTS AND INTELLECTUAL PROPERTY

22. Louis Vuitton is one of the most well-known fashion brands and manufacturers of luxury items. It produces, among other things, high quality luggage, handbags, wallets and clothing. Such items sell for hundreds of dollars, and in some cases, thousands of dollars.

23. Besides being the exclusive manufacturer of its products, Louis Vuitton is also the exclusive distributor of its products.

24. All of Louis Vuitton's products bear one or more of Louis Vuitton's trademarks registered with the United States Patent and Trademark Office.

25. Commencing at least as early as 1931, Louis Vuitton has continued to register its trademarks in the United States Patent and Trademark Office, and to use its rightfully owned trademarks in interstate commerce in connection with its sale of its products.

26. Louis Vuitton is the owner of numerous federally registered trademarks, including, but not limited to, the trademarks identified in Exhibit A attached hereto (collectively the "Louis Vuitton Trademarks").

27. The federal registrations of the Louis Vuitton Trademarks constitutes *prima facie* evidence of their validity and conclusive evidence of Louis Vuitton's exclusive right to use the Louis Vuitton Trademarks in connection with the goods identified therein and other commercial goods, and is sufficient notice to Defendants and their Tenants of Louis Vuitton's ownership and exclusive rights in and to the Louis Vuitton Trademarks.

28. At present, Louis Vuitton's U.S. trademark registrations remain in force and are, in most cases, incontestable.

29. The Louis Vuitton Trademarks have been used by Louis Vuitton to identify and promote its products in the United States and other parts of the world.

30. The Louis Vuitton Trademarks are famous, entitling them to substantial protection under the law.

31. Louis Vuitton's goods, so marked, have been and are now recognized and exclusively associated by the fashion industry, consumers and the general public as those of Louis Vuitton.

32. While genuine Louis Vuitton products are sold throughout the United States, they are sold only through Louis Vuitton stores, the louisvuitton.com web site, and Louis Vuitton boutiques located within department stores, such as Saks, Neiman Marcus, and Bloomingdales.

33. The Louis Vuitton Trademarks have been continuously used by Louis Vuitton, and have never been abandoned.

34. As a result of Louis Vuitton's extensive advertising, the widespread sale of Louis Vuitton merchandise and the fame that the Louis Vuitton Trademarks have achieved, the goodwill associated with the Louis Vuitton Trademarks is of inestimable value to Louis Vuitton.

35. The Louis Vuitton Trademarks are highly distinctive and arbitrary, and have become associated by the public with products of the highest quality and reputation.

### VI.   DEFENDANTS' UNLAWFUL CONDUCT

36. Consistent with the "hear no evil, see no evil" mentality that Defendants have employed at the Market, Defendants have allowed many of their Tenants to sell or offer for sale merchandise bearing counterfeits of the Louis Vuitton Trademarks including, but not limited to, luggage, handbags, wallets, key rings, cell phone accessories, scarves, hats, shirts, belts, bathing suits, sandals, and watches.

7

37. Defendants knew, know, had reason to know, or have reason to know, of their Tenants' trademark violations.

38. While the counterfeiting activities of Defendants' Tenants were often open and/or obvious, on numerous occasions, Defendants were notified of some of the counterfeiting taking place at the Market, including the counterfeiting of the Louis Vuitton Trademarks. Some of the notices from Louis Vuitton to Defendants specifically informed Defendants of certain Tenants who had repeatedly sold and offered for sale goods bearing counterfeit Louis Vuitton Trademarks. Yet, Defendants did not take such notices seriously and continued to lease space to their counterfeiting Tenants, including to several repeat offenders.

39. In plain view, law enforcement agencies have seized counterfeit items from Tenants at the Market, including goods bearing counterfeits of the Louis Vuitton Trademarks. Louis Vuitton had previously alerted the Defendants to the counterfeiting activities of some of these Tenants and notified the Defendants of the seizures of items bearing counterfeits of the Louis Vuitton Trademarks. Yet, Defendants continued to lease space to their counterfeiting Tenants, including to several repeat offenders.

40. In plain view, law enforcement has arrested some of the Market's counterfeiting Tenants on the Market's grounds, including those engaged in the sale of goods bearing counterfeits of the Louis Vuitton Trademarks. Louis Vuitton had previously alerted the Defendants to the counterfeiting activities of some of these Tenants and notified the Defendants of such arrests. Yet, Defendants continued to lease space to their counterfeiting Tenants, including to several repeat offenders.

41. In plain view, some of Defendants' counterfeiting Tenants have also been served with cease and desist letters by intellectual property owners, including Louis Vuitton. Louis Vuitton and other intellectual property owners had previously alerted the Defendants to the counterfeiting activities of some of these Tenants and notified the Defendants of the service of such cease and desist letters. Yet, Defendants continued to lease space to their counterfeiting Tenants, including to several repeat offenders.

42. While it does not take an expert to figure out that low priced, cheap looking "Louis Vuitton" items offered for sale at the Market do not bear genuine Louis Vuitton Trademarks, the Henns — who own numerous genuine Louis Vuitton items — are aware of the price and quality of genuine Louis Vuitton items.

43. Notwithstanding such ownership, for well over a year, Louis Vuitton repeatedly offered to train Defendants regarding the differences between genuine and counterfeit items. Defendants repeatedly declined such offers.

44. While Defendants belatedly agreed to accept such training from Louis Vuitton — which was provided at Louis Vuitton's time and expense — it proved to be a waste of Louis Vuitton's time and money, as counterfeiting continued to be rampant at the Market and Defendants continued to lease space to persons they knew or had reason to know were engaged in the sale of products bearing counterfeits of the Louis Vuitton Trademarks.

45. Although Defendants collectively own, operate, supervise, manage and control the Market, they have not done so in a manner to prevent the sale at the Market of items bearing counterfeits of intellectual property. Instead, Defendants have repeatedly

9

looked the other way when counterfeiting is taking place at the Market and/or have acted to assist, facilitate and/or enable such unlawful activity.

46.     Defendants have materially contributed to the counterfeiting activities taking place at the Market by providing the site, facilities, environment and platform for the Tenants' unlawful conduct. Defendants provide all of the services necessary for their Tenants to operate at the Market. Among other things, the Tenants at the Market are provided with basic requirements such as space, security, parking, maintenance of the Market's grounds (including cleaning and repair), restrooms and concessions. Moreover, Defendants have advertised and promoted the Market, and have worked to attract customers to the Market.

47.     Furthermore, Defendants have failed to implement rules or employ practices and procedures that would reduce or eliminate the counterfeiting occurring at the Market. Among other things, Defendants have failed to: a) refrain from renewing the leases (and/or licenses) of Tenants at the Market who have been engaged in the sale of items bearing counterfeits of the Louis Vuitton Trademarks; b) terminate the leases (and/or licenses) of Tenants at the Market who have been engaged in the sale of items bearing counterfeits of the Louis Vuitton Trademarks; c) seek the voluntary departure of Tenants at the Market who have been engaged in the sale of items bearing counterfeits of the Louis Vuitton Trademarks; d) promptly initiate eviction proceedings against Tenants at the Market who have been engaged in the sale of items bearing counterfeits of the Louis Vuitton Trademarks; e) monitor the sales of its Tenants, including the goods being offered for sale by the Market's Tenants; f) use their already installed cameras at the

10

Market to curb or deter counterfeiting; or g) hire investigators to assist the Defendants in addressing their counterfeiting problem at the Market.

48.     While Defendants employ personnel to patrol the Market, such personnel only serve to assist in the unlawful conduct of the Market's Tenants because they fail to take affirmative steps to curb, prohibit, detect and/or prevent the sale of items bearing counterfeits of the Louis Vuitton Trademarks.  For example, on one of the occasions when Louis Vuitton's investigators went to the Market, they made undercover purchases of merchandise bearing counterfeit Louis Vuitton Trademarks from eighteen (18) different Tenants at the Market, including several repeat offenders that had been previously brought to the Defendants' attention.  At the time, members of the Market's security staff were observed patrolling in the very locations where the counterfeiting was taking place, yet were taking no steps with respect to the ongoing counterfeiting activity.

49.     The illegal activity which has taken place at the Market has occurred despite the fact that the Defendants and the Market have (and have had) the right and ability to control their Tenants and/or the use of the space supplied to the Tenants (*i.e.*, the means of the Tenants' infringement).  For example, and without limitation, Defendants require the Market's Tenants to refrain from: a) selling certain types of products; b) using cardboard boxes; c) using blue tarps; d) being rude to customers; e) using electric extension cords; f) making excessive noise; g) using PA systems; h) using generators; i) cooking; and j) swapping spaces with other Tenants.

50.     In addition, and without limitation, Defendants also require the Market's Tenants to: a) clean up their spaces; b) sell certain products only in designated areas; c)

use certain types of merchandise bags; d) sell only within the confines of their spaces; e) collect sales tax; f) be open on certain days and at certain times; g) have a professional appearance and good hygiene; h) permit inspection by the Market of their products; i) park only in the spot assigned to them; and j) maintain tables and displays in good condition.

51. In fact, Defendants specifically reserve the right to remove Tenants from the Market if they fail to abide by any of Defendants rules and/or lease terms.

52. Moreover, Defendants have the ultimate form of control over the means of infringement insofar as Defendants have the ability to: a) refrain from renewing the leases (and/or licenses) of Tenants at the Market who have been engaged in the sale of items bearing counterfeits of the Louis Vuitton Trademarks; b) terminate the leases (and/or licenses) of Tenants at the Market who have been engaged in the sale of items bearing counterfeits of the Louis Vuitton Trademarks; c) seek the voluntary departure of Tenants at the Market who have been engaged in the sale of items bearing counterfeits of the Louis Vuitton Trademarks; and/or d) promptly initiate eviction proceedings against Tenants at the Market who have been engaged in the sale of items bearing counterfeits of the Louis Vuitton Trademarks.

53. In short, the Market is a controlled environment where Defendants and the Market have comprehensive rules governing the use of Defendants' space, what Tenants can sell and how Tenants must conduct themselves while at the Market.

54. Louis Vuitton has never authorized the sale of Louis Vuitton merchandise or the use of the Louis Vuitton Trademarks at the Market and has so notified Defendants

on multiple occasions. Nevertheless, Defendants have allowed counterfeiting to occur at the Market despite Louis Vuitton's (and other intellectual property owners') pleas to Defendants to "clean up" the Market, and even though Defendants knew, know or had reason to know that trademark counterfeiting is against the law.

55. Defendants know, knew or had reason to know that a substantial amount of items bearing counterfeits of the Louis Vuitton Trademarks have been (and are being) sold or offered for sale at the Market.

56. Defendants have failed to supervise their premises and comply with their legal obligations to cease leasing space to Tenants they knew or had reason to know were selling products bearing counterfeits of the Louis Vuitton Trademarks at the Market because Defendants would make less money if they did so. In fact, if Defendants kicked out all of the Market's counterfeiters, Defendants' revenues and profits would significantly decline.

57. Defendants have been aware of, materially contributed to, and obtained a financial benefit from the sale of merchandise bearing counterfeits of intellectual property at the Market (including the Louis Vuitton Trademarks). Among other things, Defendants reap substantial financial benefits derived from the "draw" of counterfeit items at the Market, including, but not limited to, increased: customer traffic; food court sales; numbers of Tenants; storefront/booth rental revenue; parking revenue; and value of their business. Defendants are financially motivated to "turn a blind eye" to counterfeiting at the Market, or to affirmatively assist in the counterfeiting and infringement and protect their counterfeiting Tenants.

58. By engaging in their unlawful conduct, Defendants have enjoyed the financial fruits of continuing to do business with their counterfeiting Tenants.

59. Under the circumstances, Defendants had (and have) an obligation to take all steps necessary to cease leasing space to Tenants they knew or had reason to know were selling products bearing counterfeits of the Louis Vuitton Trademarks at the Market. However, Defendants have failed to do so. Indeed, the counterfeiting of the Louis Vuitton Trademarks by Tenants at the Market continues to this very day.

60. Defendants have acted with reckless disregard for Louis Vuitton's rights and/or were willfully blind in connection with their unlawful actions and inaction in this matter. For instance, on one occasion when law enforcement attempted to speak with Defendant Preston B. Henn about some seizures of counterfeit merchandise they were about to execute at the Market, the authorities were told that Mr. Henn was unavailable because he was taking a nap in his office. On another occasion, when Mr. Henn was advised in writing by Louis Vuitton about the continued counterfeiting of the Louis Vuitton Trademarks at the Market, Mr. Henn responded with a sarcastic letter (to Louis Vuitton's executives, anti-counterfeiting personnel and in-house counsel) about condoms bearing the Louis Vuitton Trademarks.

61. Alternatively, Defendants have intentionally allowed counterfeiting activities to occur and continue at the Market.

62. Therefore, this case constitutes an exceptional case under 15 U.S.C. § 1117(a); likewise, it entitles Louis Vuitton to all of the remedies set forth in 15 U.S.C. §§ 1117(b) and (c).

63. The unlawful use by the Market's Tenants of the Louis Vuitton Trademarks is likely to cause consumers, the public and the trade to erroneously believe that the goods they sold are authorized, sponsored, or approved by Louis Vuitton when, in fact, they are not. By using counterfeits of the Louis Vuitton Trademarks, Defendants' Tenants have traded on the goodwill and reputation of Louis Vuitton, and have created the false impression that their goods are Louis Vuitton's legitimate products.

64. Among other things, the distribution, sale, offers of sale, display, promotion, marketing and advertisement by Defendants' Tenants of their products bearing counterfeits of the Louis Vuitton Trademarks has and will: reflect adversely on Louis Vuitton as the believed source of origin thereof; hamper continuing efforts by Louis Vuitton to protect its outstanding reputation for high quality, originality and distinctive goods; and tarnish the goodwill and demand for genuine Louis Vuitton merchandise.

65. The counterfeiting of the Louis Vuitton Trademarks at the Market is likely to cause, is causing and will continue to cause a likelihood of confusion, deception and mistake on the part of consumers, the public and the trade. This confusion causes, and will continue to cause, irreparable harm to Louis Vuitton and dilutes the distinctive quality of the Louis Vuitton Trademarks. Accordingly, Louis Vuitton has no adequate remedy at law and Defendants must be enjoined from any further conduct contributing in any way to the counterfeiting and infringement of the Louis Vuitton Trademarks.

66. Defendants have been unjustly enriched by allowing their Tenants to illegally use and misappropriate Louis Vuitton's intellectual property.

67. Moreover, Louis Vuitton has suffered harm as a result of the acts of Defendants in an amount thus far not determined. The injuries and damages sustained by Louis Vuitton have been directly and proximately caused by Defendants' wrongful conduct.

## VII.   CLAIM FOR CONTRIBUTORY TRADEMARK INFRINGEMENT

### (Against All Defendants)

68. Louis Vuitton hereby incorporates by reference the allegations set forth above in paragraphs 1 through 67.

69. The unauthorized use of the Louis Vuitton Trademarks at the Market by several of Defendants' Tenants is likely to cause and is causing confusion, mistake and deception.

70. The use of the Louis Vuitton Trademarks at the Market by several of Defendants' Tenants infringes upon the Louis Vuitton Trademarks in violation of section 32(1) of the Trademark Act of 1946 as amended (the "Lanham Act"), 15 U.S.C. § 1114(1).

71. Through their actions, inaction and conduct, Defendants have materially contributed to the above-described counterfeiting and infringement of the Louis Vuitton Trademarks.

72. Among other things, Defendants have continued to supply the site, space, facilities and a market place to Tenants that Defendants knew or had reason to know were selling or offering for sale products bearing counterfeits of the Louis Vuitton Trademarks.

73. Hosts such as Defendants who permit their Tenants to use Defendants' premises cannot remain willfully blind to their Tenants' directly infringing acts.

74. Defendants' conduct constitutes contributory infringement of the Louis Vuitton Trademarks.

75. By reason of the foregoing, Defendants are liable to Louis Vuitton for any and all of the remedies available to Louis Vuitton under 15 U.S.C. §§ 1116 and 1117 of the Lanham Act.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, Louis Vuitton demands Judgment against Defendants, and each of them, jointly and severally, as follows:

A. That pursuant to and in accordance with 15 U.S.C. § 1116, preliminary and permanent injunctions be issued enjoining the Defendants and each of them, and their respective officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with each or any of them, from, directly or indirectly: 1) continuing to lease space to Tenants that Defendants know or have reason to know are selling or offering for sale products bearing counterfeits of the Louis Vuitton Trademarks; 2) allowing Tenants at the Market who have been or are currently engaged in the sale or offer for sale of merchandise bearing counterfeits of the Louis Vuitton Trademarks to continue doing business at the Market; 3) causing, contributing to, enabling, facilitating, allowing, tolerating, or participating in the counterfeiting or infringement of any of the Louis Vuitton Trademarks; 4) counterfeiting or infringing any of the Louis Vuitton Trademarks; 5) using any reproduction, counterfeit, copy or

colorable imitation of the Louis Vuitton Trademarks; 6) using the Louis Vuitton Trademarks in a manner calculated to falsely represent, or which has the effect of falsely representing, that products sold at the Market are sponsored by, authorized by, or in any way associated with Louis Vuitton; and 7) otherwise unfairly competing with Louis Vuitton.

B. That Louis Vuitton be awarded statutory damages from each of the Defendants in an amount of up to $2,000,000 per counterfeited mark per each type of goods (as provided by 15 U.S.C. § 1117(c) of the Lanham Act as amended), or, at Louis Vuitton's election, that Defendants be required to account to Louis Vuitton for all damages and/or profits resulting from the unlawful activities of Defendants and/or their Tenants, and that the award to Louis Vuitton be trebled as provided for under 15 U.S.C. §1117.

C. That Louis Vuitton be awarded a sum that is just under the facts and circumstances of this action in accordance with 15 U.S.C. § 1117.

D. That Louis Vuitton be awarded pre-judgment interest in accordance with 15 U.S.C. §1117.

E. That Louis Vuitton be awarded its costs and expenses of this action, including, but not limited to, Louis Vuitton's attorneys' fees, investigators' fees and other costs as provided for under 15 U.S.C. § 1117.

F. That Louis Vuitton be awarded all other and further relief as the Court may deem just and proper under the facts and circumstances of this case.

## IX.     JURY DEMAND

Louis Vuitton hereby demands a trial by jury.

Dated:  January 15, 2014          Respectfully submitted,

　　　　　　　　　　　　　　　　　　s/Harry R. Schafer
　　　　　　　　　　　　　　　　　　Harry R. Schafer, Esq. (FL Bar # 508667)
　　　　　　　　　　　　　　　　　　hrs@knpa.com
　　　　　　　　　　　　　　　　　　KENNY NACHWALTER, P.A.
　　　　　　　　　　　　　　　　　　201 South Biscayne Boulevard
　　　　　　　　　　　　　　　　　　Suite 1100 - Miami Center
　　　　　　　　　　　　　　　　　　Miami, Florida  33131-4327
　　　　　　　　　　　　　　　　　　Telephone: (305) 373-1000
　　　　　　　　　　　　　　　　　　Facsimile: (305) 372-1861
　　　　　　　　　　　　　　　　　　*Counsel for Plaintiff Louis Vuitton*

*476649*